**ORIGINAL**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>ex rel, DONALD STEVEN MCLENDON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COLUMBIA HEALTHCARE )<br>CORPORATION a/k/a )<br>Columbia/HCA Healthcare )<br>Corporation, COLUMBIA )<br>HOMECARE GROUP, OLSTEN )<br>CORPORATION, OLSTEN )<br>HEALTH SERVICES a/k/a )<br>Olsten Kimberly Quality )<br>Care, OLSTEN HEALTH )<br>MANAGEMENT a/k/a )<br>Hospital Contract )<br>Management Services, )<br>IASD HEALTH SERVICES CORP. )<br>d/b/a BLUE CROSS BLUE SHIELD )<br>OF IOWA, FISCAL )<br>INTERMEDIARIES U,V,W,X,Y and Z, )<br>CENTRAL HEALTH MANAGEMENT )<br>SERVICES, INC., and SIMIONE )<br>CENTRAL, INC. n/k/a Simione )<br>Central National, Inc., a Georgia )<br>corporation, )<br>)<br>Defendants. ) | **FILED IN CAMERA AND UNDER SEAL**<br><br>CIVIL ACTION NO. 1:97-CV-0890<br><br>**JURY TRIAL DEMANDED**<br><br>CA99-3295<br><br>**FILED**<br><br>DEC 1 4 2000<br><br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |

**PLAINTIFF'S FIRST AMENDMENT TO COMPLAINT**

COMES NOW, Donald Steven McLendon, Plaintiff in the above-styled action, by and through his counsel of record, Harmon, Smith, Bridges & Wilbanks and The Jim Thomas Law Office, and files his First Amendment To Complaint pursuant to Fed.R.Civ.P. 15 as a matter of right. This Amendment is also filed pursuant to Fed.R.Civ.P. 19 as additional



parties are named herein as Defendants. This Amendment is filed to further clarify and explain the allegations previously set forth in Plaintiff's Complaint by restating through amendment Paragraphs 9(a), 9(b), 70(a), 70(b), 75(a), Count V (Paragraphs 78-82), 85(a) and Count VI (Paragraphs 99-101). All other paragraphs, allegations and prayers for relief originally set forth in Plaintiff's Complaint are expressly incorporated and made a part of this First Amendment To Complaint by reference as if expressly set forth herein.

Plaintiff hereby amends his Complaint to add more specificity and supporting facts to the allegations and causes of action originally pled in Plaintiff's Complaint.

The paragraphs to be added by amendment are as follows:

9(a).

Defendant Central Health Management Services, Inc. (hereinafter "Central") is a Delaware corporation with headquarters in Atlanta, Georgia. Central transacts business within the Northern District of Georgia and throughout Georgia and Florida. Plaintiff has it, upon information and belief, that as of January 18, 1996, Central amended its Articles of Incorporation to change its name to Simione Central Holdings, Inc. Service can be made on Central by and through its registered agent: Mr. Jerry Sevy at Central's registered office located at 6600 Powers Ferry Road, Suite 300, Atlanta, Cobb County, Georgia 30339.

9(b).

Defendant Simione Central, Inc., n/k/a Simione Central National, Inc., is a Georgia corporation with its registered agent and office in Atlanta, Georgia. Simione Central, Inc. n/k/a Simione Central National, Inc. (hereinafter "SCI"), is transacting business in the Northern District of Georgia. SCI provides services and manages homecare agencies for

Columbia and other hospital companies. Service may be made on SCI by and through its registered agent, Mr. James A. Tramonte at: 6600 Powers Ferry Road, Suite 300, Atlanta, Cobb County, Georgia 30339.

70(a).

Additionally, HCCs are billing Medicare for discharge planning and case finding services provided to patients prior to admission orders from a physician to the hospital's homecare agency. The HCC's salary is treated as an allowable cost. However, statistically, much of the HCC's time and effort are expended in discharge planning/case-finding concerning patients discharged to nonaffiliated homecare agencies. Despite this fact, Columbia does not reallocate this expense (HCC salary) to the hospital payroll(s). This is another example of illegal cost shifting. Medicare reimbursement received for this billing practice violates the False Claims Act.

70(b).

HCCs are also engaging in case management and discharge planning work that is unrelated to homecare cases. For instance, HCCs have been performing generic discharge planning functions at West Paces Hospital for the last year because the hospital's social workers were terminated. The reimbursement requests submitted to Medicare for this social work by HCCs is illegal. Plaintiff believes that this fraudulent practice is ongoing on a national basis.

75(a).

An additional example of Medicare abuse involves hospital personnel from Port St. Lucie Medical Center which is owned by Columbia. The CFO of Port St. Lucie Medical

Center, Mike Sears, recently admitted to OHM executives that he took his hospital staff to Disney World in Orlando, Florida, and shifted the cost of the recreational excursion to Medicare by labeling the expense as a homecare related expense for which reimbursement was paid by Medicare.

## COUNT V

### COLUMBIA BUYS HOMECARE AGENCIES BASED UPON FRAUDULENT SCHEMES WHICH HAVE THE RESULT OF UNLAWFULLY SHIFTING PURCHASE/ACQUISITION COSTS TO MEDICARE

78.

Plaintiff restates and reavers the allegations contained in Paragraphs 1-77 of Plaintiff's Complaint as if each were stated herein in its entirety and said allegations are incorporated herein by reference.

79(a).

Columbia buys homecare agencies across the country using Medicare funds.

79(b).

Columbia illegally conspires with homecare agency sellers and homecare agency management companies to unlawfully shift purchase/acquisition costs of the Columbia transactions to Medicare.

79(c).

The net effect of the conspiracy is that Columbia directly and indirectly uses Medicare dollars to subsidize its acquisition of homecare agencies through illegal cost shifts which are achieved by disguising unreimbursable events as being allowable costs.

79(d).

A common fraudulent scenario involves a scheme where Columbia pays a discounted amount to the seller up front (because this amount can't be passed through to Medicare) and the selling entity recoups any discounted amounts through inflated or duplicitous and illegal management fees and contracts reached with Columbia as a part of the sales transaction. Count IV of Plaintiff's Complaint explains this illegal practice in some detail.

79(e).

Alternatively, in other instances, Columbia acquisitions are based on exorbitant prices (in terms of purchase price and cash flow after the sale) paid to homecare agency sellers. Columbia can afford to pay inflated prices because Columbia often passes transaction costs to Medicare. These schemes result in overpayment by Medicare to Columbia for homecare expenses which are then syphoned back to the selling or managing entities. This scheme regularly involves inflated and illegal management fees which are paid to selling entities or successor entities as described in Count IV of Plaintiff's Complaint as previously filed.

80(a).

By way of example, in late 1996 or early 1997, Columbia systematically began to buy homecare agencies formerly owned by Central. Central controlled millions of patient visits in Georgia as well as in Florida. Initially, Gary Bremer (a principal of Central and SCI) refused to sell Central's homecare agencies without first reaching an agreement with Columbia that allowed his new company (SCI) to receive homecare management fees after the Columbia acquisitions.

80(b).

As a result of Central's demands, Columbia had to solicit CHG, Olsten and/or OHM to join the fraudulent scheme. Prior to the Central transaction, OHM had an exclusive right to manage Columbia's homecare patient visits under an existing separate agreement with Columbia. In fact, OHM had an exclusivity clause within its agreement with Columbia which covered Fulton County and 16 other counties in the metro-Atlanta area. Consequently, prior to the Central transaction, OHM had the power to block Columbia's opportunity to acquire Central's homecare visit market in metro-Atlanta and in Florida. (OHM had an exclusivity contract in Florida with Columbia from the Care One transaction as described in Paragraphs 81(a)-(d) hereafter). Central would not complete the deal unless OHM's exclusivity rights were modified. As a result of the above, CHG, SCI and OHM are regularly receiving fees per visit for the same patient visit. Medicare is not receiving appropriate value for the reimbursement paid in management fees to CHG, SCI and OHM. Medicare is being over-billed as a part of this redundant and illegal billing scheme.

80(c).

A review of the terms negotiated in the Central deal is revealing. OHM agreed to pay approximately $8,000,000 toward the $58,000,000 purchase price for the Central deal. This Columbia-OHM transaction was booked to reflect on the following approximate allocations: 2.8 million dollars toward the acquisition of a hospice (the hospice was worth substantially less and is now being offered for sale at less than $500,000 by OHM); approximately 1.9 million dollars for certain tangible property and assets (the tangible assets were never delivered to OHM and/or OHM received little or nothing in exchange for this

amount); and approximately $3,000,000 was paid by OHM for exclusivity rights allegedly purchased by OHM for eight Georgia counties (OHM had already purchased exclusivity rights for these same counties from Columbia in an earlier transaction. Moreover, OHM actually lost over half of the 17 counties where OHM already had exclusivity rights with Columbia in Georgia as a direct result of the Central transaction. OHM also lost exclusivity and business in Florida counties because of the Central transaction).

80(d).

The only gain for OHM in this deal was its capture of the future cash streams related to patient visits paid in a "per visit" manner by the individual Columbia hospitals via management fees. These fees are reimbursed as allowable dollars by the Medicare Program, thus costing the hospitals and Columbia nothing.

80(e).

Columbia's motive in the Central deal is obvious. Columbia obtained millions of patient homecare visits. Columbia acquired large agencies in the metro-Atlanta market (Dunwoody and West Paces) which presently generate tremendous profits to Columbia. Additionally, Columbia acquired multiple homecare agencies in northwest Florida which also presently generate a tremendous amount of revenue to Columbia (and CHG, OHM and SCI).

80(f).

SCI was formed by Central to receive management fees for homecare visits purchased by Columbia in the Central deal. SCI and OHM have already received millions

of dollars in management fees to date that were generated from the Central deal. Top executives within Central are also owners of SCI.

80(g).

The unlawful and often duplicitous management fees paid to OHM and SCI (exclusive of the management fees received by CHG) by Columbia are fruits of this fraudulent scheme because Columbia receives reimbursement from Medicare for these fraudulent billings and then passes the funds to CHG, OHM and SCI. This mode of cost shifting was a primary financing mechanism used by Columbia to acquire the homecare agencies involved in the Central deal.

80(h).

The net affect of the myriad of transactions described above is Medicare fraud. These blatant violations of the False Claims Act have resulted in tens of millions of dollars in illegal Medicare cost allowances. The essence of the Central transaction was the unlawful purchase of patient visits rather than "assets."

80(i).

Much of the information detailed herein concerning the Central deal was described during an April 2, 1997, conversation between Terry Mitchell and Plaintiff. Mr. Mitchell referenced Phillip Unger, Rick Scott, Bob Fusco and Sam Grecco of Columbia as being individuals who had direct knowledge concerning the structuring of the Central deal. Mr. Mitchell stated that Mr. Unger attempted to change the initial purchase price that had been agreed on by Mr. Fusco and Mr. Grecco. However, Mr. Mitchell interceded and demonstrated to Mr. Unger that increasing the purchasing price was counter-productive

since purchase costs are not reimbursable by Medicare. Instead, OHM structured the transaction so that its cost per visit rate would increase which would trigger more reimbursement by Medicare to Columbia.

81(a).

Another illustrative example of a fraudulent scheme devised by Columbia to use Medicare funds as a financing tool involves the Care One Inc. (hereinafter "Care One") transactions. As a part of these transactions, Olsten and/or OHM was required to pay a part of Columbia's acquisition costs. The exact amount required of OHM is not known at present to the Plaintiff, but the amount is believed to substantially exceed $10,000,000.

81(b).

In exchange for OHM's financial contribution toward the transaction price, OHM was the beneficiary of an exclusivity arrangement with Columbia that covered the entire State of Florida. Due to the high volume of homecare visits in Florida, the Care One transaction was a major acquisition for Columbia and OHM.

81(c).

OHM benefitted directly in that it exchanged its portion of the payment of the Care One purchase price to Columbia for homecare exclusivity rights in Florida which would capture millions of patient visits within that State for OHM. Huge management fees are being paid to OHM with Medicare funds to replace the initial transaction costs expended by OHM in the Columbia/Care One purchase. OHM did not provide sufficient value to Medicare to justify the management fees received. Again, the taxpayers paid for a significant portion of Columbia's purchase with regard to the Care One deal.

81(d).

This information was obtained, in pertinent part, from OHM employees Roy Gingrich, Terry Mitchell and Lynn Beasley.

82.

Plaintiff has it, upon information and belief, that the fraudulent schemes described within each Count of Plaintiff's Complaint, inclusive of Count V, involve calculated acts of fraud on a nationwide basis. The acts of Medicare fraud which occurred in Georgia, Florida and Alabama as described herein are used as examples of fraudulent conduct which exists on a larger geographic and monetary scale across the entire United States.

85(a).

Another scheme created and allowed by Columbia involves double billing to Medicare for a nursing visit. In the Fort Lauderdale, Florida, area, Columbia Hospital nurses make home nursing visits. This is legal. However, it is not legal to bill for the nursing visit and simultaneously to bill Medicare for a home health aid visit for the same acts or services by the same provider. The practice of using a Columbia nurse to bill twice (for a single legitimate nursing visit and simultaneously home health aid visit ) is a common and well known practice among Columbia and OHM management.

## COUNT IX

### MEDICARE IS BEING ILLEGALLY CHARGED FOR HOMECARE VISITS OCCURRING IN PERSONAL CARE HOMES

99.

Plaintiff restates and reavers the allegations contained within Paragraphs 1 through 98 of Plaintiff's Complaint as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

100.

Columbia, OHM and SCI are conspiring to illegally bill Medicare for homecare visits in personal care homes in Georgia.

101.

Columbia and OHM have admitted to Plaintiff that this billing practice is unlawful. Deb Louchart researched the legality, or lack thereof, of this practice on behalf of Columbia. Barbara Maxedon and OHM Area Directors are aware of this fraudulent scheme. This scheme results in Medicare being billed for approximately 5,000 home care visits per month for visits occurring in personal care homes in Georgia. Plaintiff also has it, upon information and belief, that Columbia, SCI and OHM engage in similar schemes involving personal care homes in Florida and other states within the United States where Columbia, SCI and OHM do business.

WHEREFORE, Plaintiff prays that:

 (a)   Plaintiff's Complaint be amended as requested herein, and that the prayer for relief initially set forth in the Complaint be incorporated and included herein as originally plead;

(b)  The Plaintiff and the United States have whatever other relief that this Court would deem to be just and equitable; and

(c)  That Plaintiff have and recover the maximum amount that he is entitled to recover pursuant to the letter and intent of the False Claims Act, Qui Tam statutes and case law and any other law or regulation whatsoever which allows monetary compensation to private citizens for reporting acts of fraud and abuse against the United States.

This 23rd day of July, 1997.

        Respectfully submitted,

        HARMON, SMITH, BRIDGES & WILBANKS

        By: _____
           Marlan B. Wilbanks
           Ga. Bar No. 758223

        By: _____
           Ty M. Bridges
           Ga. Bar No. 081500

        Attorneys for Plaintiff Donald Steven McLendon

1795 Peachtree Road, N.E.
Suite 350
Atlanta, Georgia  30309-2339
404/881-1200

Co-Counsel for Donald Steven McLendon:

James M. Thomas, Esq.
The Jim Thomas Law Office
1795 Peachtree Road, N.E.
Suite 350
Atlanta, Georgia  30309-2339
404/881-1200